IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs November 1, 2019

## IN RE JAYDIN A. ET AL.

**Appeal from the Juvenile Court for Wilson County**
**No. 95-JC-2017-JT-9      Charles B. Tatum, Judge**

_____

**No. M2018-02145-COA-R3-PT**
_____

Father appeals the trial court's decision to terminate his parental rights on grounds of abandonment by an incarcerated parent and failure to manifest a willingness and ability to assume custody. The evidence at trial showed that due to Father's repeated criminal conduct, including two instances where Father fled the State to escape justice, he has had no contact with his daughter for approximately 95% of the child's life. Because we conclude that the evidence was clear and convincing as to both grounds for termination and best interest, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**

J. STEVEN STAFFORD, P.J., W.S., delivered the opinion of the court, in which CHARLES D. SUSANO, JR. and ANDY D. BENNETT, JJ., joined.

Sonia Jennings Boss, Nashville, Tennessee, for the appellant, Michael M.

Herbert H. Slatery, III, Attorney General and Reporter; and Amber L. Seymour, Assistant Attorney General, Nashville, Tennessee, for the appellee, Tennessee Department of Children's Services.

W. Michael Kilgore, Mount Juliet, Tennessee, Guardian ad litem.

### OPINION

### I.      BACKGROUND

On December 5, 2017, Petitioner/Appellee the Tennessee Department of Children's Services ("DCS") filed a petition to terminate the parental rights of Respondent/Appellant Michael M.[1] ("Father") to his minor child, born in March 2017.[2]

_____

[1] In cases involving termination of parental rights, it is this Court's policy to remove the full

The petition alleged as grounds abandonment by an incarcerated parent and failure to manifest a willingness and ability to assume custody.

A termination trial occurred on September 25, 2018. Much of the testimony concerned Father's criminal history and incarceration. Father was incarcerated at the time of trial and had been incarcerated continuously from April 16, 2018, until the date of trial.[3] Father testified that he would be automatically paroled in nine months so long as he completed a drug program. Father admitted that he was incarcerated on his eighteenth birthday and thereafter for the majority of the child's life.

Specifically, at the time that the child was born, Father was on probation for possession of methamphetamine and possession of drug paraphilia. Approximately one month after the child's birth, Father chose to flee from Tennessee to Ohio, taking the child and her mother along. Father was apprehended in April 2017, and the child was taken into DCS custody at that time. Eventually, Father was transferred back to Tennessee, where he served approximately seven months in jail. Upon release, Father was subject to ankle monitoring. Sixteen days after his release, however, Father cut off his "ankle bracelet" and fled to Texas. He was apprehended thirteen days later and returned to Tennessee. Father further testified that in the eighteen months following the removal of the child, he was released and re-incarcerated on multiple occasions, with a total of three to four months out of incarceration, "maybe a month at a time." More specifically, Father testified that in the four months prior to the filing of the termination petition, he was incarcerated except for "a week or two at a time."

Father admitted that a large portion of his criminal charges stemmed from Father's drug addiction, specifically to methamphetamine. Father testified that he is participating in a drug treatment program in prison. Father further testified that he is able to financially support the child due to a disability check and recently inheriting his parents' home. When the trial court questioned Father about whether Father would "squander [the inheritance] on drugs," Father replied that "I mean, I just got to take it one day at a time. I don't know if it's going to happen. I just got to put my faith in God and hope it don't and just try."

The child was a little over one month old at the time of the removal. The child was thereafter placed in the same foster home with her half-sibling, where she remained at the time of trial, a period of approximately eighteen months. The DCS worker testified that the child is bonded with her foster family. The foster family hopes to adopt both the child

---

names of children and other parties to protect their identities.

[2] The caption of this case refers to the child-at-issue's half sibling. Mother surrendered her parental rights to both children prior to the filing of the petition. The petition also sought to terminate the parental rights of Jaydin's father. His rights were terminated after he did not participate. Neither Jaydin nor his father is at issue in this appeal.

[3] During this period, Father was serving time in different counties.

- 2 -

at issue and her half-sibling. Following the removal of the child, Father had no contact with the child. Although the DCS worker testified that Father once texted her to ask for photographs of the child, Father denied this, stating that "I didn't have a conversation because I don't give people my phone numbers that's involved in stuff like that because that's a way for me to get caught. . . . DCS can rat you out to authorities, so why would I give my number to DCS?" Father did admit that one DCS worker did contact him at one point prior to the termination hearing; Father asked the DCS worker whether he should surrender his parental rights, and the DCS worker replied that she could not provide advice in that manner to Father.

The trial court entered a final order granting DCS's petition on October 31, 2018. Specifically, the trial court ruled that DCS presented clear and convincing evidence of abandonment by an incarcerated parent through wanton disregard and failure to manifest the ability and willingness to assume custody, as well as that termination was in the child's best interest. Father appealed.

## II. ISSUES PRESENTED

On appeal, Father challenges only the best interest findings made by the trial court. Because of the duty imposed on this Court by the Tennessee Supreme Court in *In re Carrington H.*, 483 S.W.3d 507, 525–26 (Tenn. 2016), we will also consider whether the grounds found by the trial court are supported by sufficient evidence.

## III. STANDARD OF REVIEW

The Tennessee Supreme Court has previously explained that:

A parent's right to the care and custody of her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions. *Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000); *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *In re Adoption of Female Child*, 896 S.W.2d 546, 547–48 (Tenn. 1995); *Hawk v. Hawk*, 855 S.W.2d 573, 578–79 (Tenn. 1993). But parental rights, although fundamental and constitutionally protected, are not absolute. *In re Angela E.*, 303 S.W.3d at 250. "'[T]he [S]tate as parens patriae has a special duty to protect minors. . . .' Tennessee law, thus, upholds the [S]tate's authority as parens patriae when interference with parenting is necessary to prevent serious harm to a child." *Hawk*, 855 S.W.2d at 580 (quoting *In re Hamilton*, 657 S.W.2d 425, 429 (Tenn. Ct. App. 1983)); *see also Santosky v. Kramer*, 455 U.S. 745, 747, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); *In re Angela E.*, 303 S.W.3d at 250.

*In re Carrington H.*, 483 S.W.3d 507, 522–23 (Tenn. 2016) (footnote omitted). In Tennessee, termination of parental rights is governed by statute which identifies "'situations in which that state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought.'" *In re Jacobe M.J.*, 434 S.W.3d 565, 568 (Tenn. Ct. App. 2013) (quoting *In re W.B.*, Nos. M2004-00999-COA-R3-PT, M2004-01572-COA-R3-PT, 2005 WL 1021618, at *7 (Tenn. Ct. App. Apr. 29, 2005) (citing Tenn. Code Ann. § 36-1-113(g))). Thus, a party seeking to terminate a parent's rights must prove: (1) existence of one of the statutory grounds and (2) that termination is in the child's best interest. Tenn. Code Ann. § 36-1-113(c); *In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

Considering the fundamental nature of a parent's rights, and the serious consequences that stem from termination of those rights, a higher standard of proof is required in determining termination cases. *Santosky*, 455 U.S. at 769. As such, a party must prove statutory grounds and the child's best interests by clear and convincing evidence. Tenn. Code Ann. § 36-3-113(c); *In re Valentine*, 79 S.W. 3d at 546. Clear and convincing evidence "establishes that the truth of the facts asserted is highly probable . . . and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from evidence[,]" and "produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established." *In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004).

In termination cases, appellate courts review a trial court's factual findings de novo and accord these findings a presumption of correctness unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d); *In re Carrington H.*, 483 S.W.3d at 523−24 (citing *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010); *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007)). Our supreme court further explains:

> The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. *In re M.L.P.*, 281 S.W.3d at 393 (quoting *In re Adoption of A.M.H.*, 215 S.W.3d at 810). Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness. *In re Angela E.*, 303 S.W.3d at 246.

*In re Carrington H.*, 483 S.W.3d at 524.

Lastly, in the event that the "resolution of an issue in a case depends upon the truthfulness of witnesses, the trial judge, who has had the opportunity to observe the witnesses and their manner and demeanor while testifying, is in a far better position than

this Court to decide those issues." ***In re Navada N.***, 498 S.W.3d 579, 591 (Tenn. Ct. App. 2016) (citing ***McCaleb v. Saturn Corp.***, 910 S.W.2d 412, 415 (Tenn. 1995); ***Whitaker v. Whitaker***, 957 S.W.2d 834, 837 (Tenn. Ct. App. 1997)). This Court therefore "gives great weight to the credibility accorded to a particular witness by the trial court." ***In re Christopher J.***, No. W2016-02149-COA-R3-PT, 2017 WL 5992359, at *3 (Tenn. Ct. App. Dec. 4, 2017) (citing ***Whitaker***, 957 S.W.2d at 837).

## IV. DISCUSSION

### A. Grounds for Termination

The trial court found two grounds for termination of Father's parental rights: abandonment by wanton disregard and failure to manifest an ability and willingness to assume custody. In this case, the evidence supporting each ground generally overlaps. This, however, is not a bar to finding multiple grounds for termination. See Tenn. Code Ann. § 36-1-113(g) ("[A]cts or omissions in one ground does not prevent them from coming within another ground[.]"). We will therefore consider each ground in turn.

### 1. Wanton Disregard

The first ground find by the trial court was abandonment through wanton disregard, found at Tennessee Code Annotated section 36-1-113(g) and 36-1-102. Under section 36-1-113(g)(1), "[a]bandonment by the parent or guardian, as defined in § 36-1-102" may constitute a ground for termination. Section 36-1-102(a) in turn contains several definitions for the statutory ground of abandonment. At the time the petition was filed, the relevant definition of abandonment provided as follows:

> A parent or guardian is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or the parent or guardian has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding, and either has willfully failed to visit or has willfully failed to support or has willfully failed to make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding such parent's or guardian's incarceration, or the parent or guardian has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child. If the four-month period immediately preceding the institution of the action or the four-month period immediately preceding such parent's incarceration is interrupted by a period or periods of incarceration, and there are not four (4) consecutive months without incarceration immediately preceding either event, a four-month period shall be created by aggregating the shorter periods of nonincarceration beginning with the most recent period of nonincarceration prior to commencement of

the action and moving back in time. Periods of incarceration of less than seven (7) days duration shall be counted as periods of nonincarceration. Periods of incarceration not discovered by the petitioner and concealed, denied, or forgotten by the parent shall also be counted as periods of nonincarceration. A finding that the parent has abandoned the child for a defined period in excess of four (4) months that would necessarily include the four (4) months of nonincarceration immediately prior to the institution of the action, but which does not precisely define the relevant four-month period, shall be sufficient to establish abandonment; . . . .

Tenn. Code Ann. § 36-1-102(a)(iv) (2017).[4] Here, the trial court specifically relied on the wanton disregard form of abandonment contained in section 36-1-102(a)(iv). Thus, DCS was required to prove that Father was "incarcerated during all or part of the four (4) months immediately preceding the institution of such action" and that Father "has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child." *Id.*

As an initial matter, Father admitted that he was incarcerated for at least a portion of the four months preceding the filing of the termination petition.[5] Incarceration alone, however, is not sufficient to support this ground. *In re Michael O.*, No. W2017-01412-COA-R3-PT, 2018 WL 576777, at *5 (Tenn. Ct. App. Jan. 26, 2018). "An incarcerated or recently incarcerated parent can be found [to have committed] abandonment only if the court finds, by clear and convincing evidence, that the parent's pre-incarceration conduct displayed a wanton disregard for the welfare of the child." *In re Audrey S.*, 182 S.W.3d 838, 866 (Tenn. Ct. App. 2005). The statutory language balances the notion that "incarceration is a strong indicator that there may be problems in the home that threaten the welfare of the child[,]" yet, "incarceration alone in not an infallible predictor of parental unfitness." *Id.* Therefore, a parent's incarceration acts as a "triggering mechanism" that allows the court to examine more closely the child's situation "to determine whether the parental behavior that resulted in incarceration is part of a broader pattern of conduct that renders the parent unfit or poses a risk of substantial harm to the welfare of the child." *Id.* As such, many cases have held that a "parent's previous criminal conduct, coupled with a history of drug abuse, constitutes a wanton disregard for the welfare of the child." *In re Navada N.*, 498 S.W.3d at 602; *see, e.g., State v. J.M.F.*, No. E2003-03081-COA-R3-PT, 2005 WL 94465, at *8 (Tenn. Ct. App. Jan. 11, 2005); *In re C. LaC.*, No. M2003-02164-COA-R3-PT, 2004 WL 533937, at *7 (Tenn. Ct. App. Mar. 17, 2004); *State v. Wiley*, No. 03A01-9903-JV-00091, 1999 WL 1068726, at *7

---

[4] This definition was amended in 2019 to remove the terms willful and willfully wherever they appear. *See* 2018 Tenn. Laws Pub. Ch. 875 (H.B. 1856), eff. July 1, 2018. The amendment went into effect following the institution of this action and is not relevant to the issues presented in this appeal.

[5] The DCS worker also testified that Father was incarcerated from October 28, 2017, to at least November 20, 2017. This period of incarceration occurred in the four months prior to the filing of the termination petition.

(Tenn. Ct. App. Nov. 24, 1999); *In the Matter of Shipley*, No. 03A01–9611–JV–00369, 1997 WL 596281, at \*5 (Tenn. Ct. App. Sept. 29, 1997). Further, "probation violations, repeated incarceration, criminal behavior, substance abuse, and the failure to provide adequate support or supervision for a child" can constitute conduct demonstrating a wanton disregard for the child. *In re Audrey S.*, 182 S.W.3d at 867–68. The court may consider a parent's behavior prior to the four months immediately preceding incarceration in finding behavior that exhibited wanton disregard for the child. *Id.* at 871.

The trial court's finding that Father's pre-incarceration conduct exhibited a wanton disregard for the child is fully supported by the record. Father was on probation for drug offenses when the child was born. After the child's birth, Father chose to flee from authorities to another state, fully knowing that this was a violation of his probation and that it would likely result in his incarceration. Father served approximately seven months in jail for that violation. Father was thereafter released, only to violate his probation again by fleeing to another state. Father admitted that between his current incarceration and the initial incarceration that caused the removal of the child, he had only been released from incarceration three or four months, no more than a month each time. Indeed, Father himself admitted that he had difficulty recalling the dates of his incarcerations as he had "been locked up so many times, I forget them." Moreover, although the dates in the record are somewhat unclear, Father admitted that he had a problem with methamphetamine that caused him to violate his probation "time after time after time." Finally, during the relevant time period, Father made little effort to contact DCS concerning the child, fearing that to do so would endanger his own freedom. Thus, Father put his desire to escape justice for his crimes ahead of his duty to parent his child. This situation presents a textbook example of a wanton disregard for a child. The trial court's decision to find clear and convincing evidence of this ground is therefore affirmed.

### 2. Willingness and Ability

Turning to the final statutory ground found by the trial court, parental rights can be terminated when

> A parent or guardian has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child.

Tenn. Code Ann. § 36-1-113(g)(14). This statutory ground is essentially two distinct elements that must each be proven by clear and convincing evidence:

> First, DCS must prove that [the parent] failed to manifest 'an ability and willingness to personally assume legal and physical custody or financial

responsibility of the child[ren].' DCS must then prove that placing the children in [the parent's] 'legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[ren].'

*In re Maya R.*, No. E2017-01634-COA-R3-PT, 2018 WL 1629930, at *7 (Tenn. Ct. App. Apr. 4, 2018) (quoting Tenn. Code Ann. § 36-1-113(g)(14)). With regard to substantial harm, this Court has explained that

> The courts have not undertaken to define the circumstances that pose a risk of substantial harm to a child. These circumstances are not amenable to precise definition because of the variability of human conduct. However, the use of the modifier "substantial" indicates two things. First, it connotes a real hazard or danger that is not minor, trivial, or insignificant. Second, it indicates that the harm must be more than a theoretical possibility. While the harm need not be inevitable, it must be sufficiently probable to prompt a reasonable person to believe that the harm will occur more likely than not.

*In re Maya R.*, 2018 WL 1629930, at *7 (quoting *Ray v. Ray*, 83 S.W.3d 726, 732 (Tenn. Ct. App. 2001) (footnotes omitted)).

In this case, there can be no dispute that Father lacks the ability to assume custody or financial responsibility for the child, as Father will not be released from jail for at least nine months.[6] There is also ample evidence that Father has failed to manifest the willingness to assume custody and financial responsibility for the child. *Cf. In re Jaxx M.*, No. E2018-01041-COA-R3-PT, 2019 WL 1753054, at *8 (Tenn. Ct. App. Apr. 17, 2019) (citing *In re Amynn K.*, No. E2017-01866-COA-R3-PT, 2018 WL 3058280, at *12 (Tenn. Ct. App. June 20, 2018); *In re Ayden S.*, No. M2017-01185-COA-R3-PT, 2018 WL 2447044, at *7 (Tenn. Ct. App. May 31, 2018)) (recognizing a dispute over what proof is required to meet this ground for termination, but avoiding the dispute by noting that the proof was sufficient under even the more stringent ground). Here, following the child's birth Father has chosen to repeatedly engage in conduct that has resulted in his incarceration, removing him from this child's life. Indeed, of the child's nineteen months, Father was a part of her life for only one of those months. Moreover, Father has refused to maintain any contact with DCS regarding his daughter, fearing that to do so would place his liberty in jeopardy. Indeed, even when the child's DCS case worker testified that Father once texted about obtaining pictures of the child, Father denied that he made even this modicum of effort because contacting DCS was "a way to get caught." Thus, Father has not been willing to place the needs of his child ahead of his desire to escape justice.

---

[6] This release would be early and is contingent on Father completing a drug program.

- 8 -

Father has also done little to show that he is ready to resume custody upon his release. Although Father testified that he had a house and cars, when asked what Father planned to do upon his release to ensure that his drug problem did not continue to ruin his life, Father had no concrete plan other than prayer and hope. As the trial court aptly concluded, "[t]he combination of long term substance abuse, inability to comport his behavior to the law, and his inability to even handle his own important matters, demonstrate his failure to manifest an ability to assume custody of [the child]."

The evidence also clearly and convincingly supports the trial court's finding that placing the child in Father's "legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child." Tenn. Code Ann. § 36-1-113(g)(14). Here, Father and the child are essentially total strangers; the child was removed from Father's care at the tender age of one month old, and Father has completely refused to make any effort to contact the child in the months following the removal. In a similar situation, this court affirmed a finding of substantial harm on the basis that removal from the child's current family and placing the child with a near-stranger of a parent would cause the child emotional harm. *State v. C.H.H.*, No. E2001-02107-COA-R3-CV, 2002 WL 1021668, at *9 (Tenn. Ct. App. May 21, 2002). Moreover, little in the record suggests that Father has made meaningful progress in addressing his drug issues or the fact that he continues to engage in criminal activity. Father could not detail any concrete steps he had taken to prepare to parent his child. Thus, placing the child in Father's care would likely result in future removal and upheaval. *Cf. In re Morgan K.*, No. M2018-00040-COA-R3-PT, 2018 WL 5733291, at *13 (Tenn. Ct. App. Oct. 31, 2018) (affirming this ground on the basis that the parent's "permanent stability is tenuous" and the parent had taken "essentially no steps to prepare himself to be able to support and care for a toddler"). As such, the trial court's finding that clear and convincing evidence was presented to terminate Father's parental rights under section 36-1-113(g)(14) is affirmed.

## B. Best Interest

Having determined that at least one ground for termination is supported by clear and convincing evidence, we proceed to consider whether clear and convincing evidence supports the trial court's determination that termination of Father's parental rights is in the child's best interests. "Upon establishment of a ground for termination, the interests of the child and parent diverge, and the court's focus shifts to consider the child's best interest." *In re Audrey S.*, 182 S.W.3d 838, 877 (Tenn. Ct. App. 2005). Even where a parent is unfit, termination may not necessarily be in the best interests of the child. *Id.*

Tennessee's termination statute lists the following factors to be used in the best interest analysis:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i).

The Tennessee Supreme Court has explained that:

Facts considered in the best interests analysis must be proven by a preponderance of the evidence, not by clear and convincing evidence. After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interests. When considering these statutory factors, courts must remember that the child's best interests are viewed from the child's, rather than the parent's, perspective. Indeed, a focus on the perspective of the child is the common theme evident in all of the statutory factors. When the best interests of the child and those of the adults are in conflict, such conflict

shall always be resolved to favor the rights and the best interests of the child.

*In re Gabriella D.*, 531 S.W.3d 662, 681−82 (Tenn. 2017) (internal citations omitted). Furthermore, "[a]scertaining a child's best interests does not call for a rote examination" of the statutory factors. *In re Audrey S.*, 182 S.W.3d at 878. The analysis requires "more than tallying the number of statutory factors weighing in favor of or against termination." *In re Gabriella D.*, 531 S.W.3d at 682 (citing *White v. Moody*, 171 S.W.3d 187, 193−94 (Tenn. Ct. App. 2004)). "The facts and circumstances of each unique case dictate how weighty and relevant each statutory factor is in the context of the case," and the analysis "must remain a factually intensive undertaking." *In re Gabriella D.*, 531 S.W.3d at 682. Thus, "[d]epending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." *Id.* (citing *In re Audrey S.*, 182 S.W.3d at 878). In undertaking this analysis, the court must examine all of the statutory factors, as well as other relevant proof put forth by the parties. *Id.*

As to the first two factors, Father argues that he has made a lasting adjustment of circumstances to make it safe and in the child's best interest to be in his home. *See* Tenn. Code Ann. § 36-1-113(i)(1) & (2). Respectfully, we cannot agree. Although Father did testify that he is participating in a drug program while incarcerated, he has yet to complete this program. Moreover, nothing in the record shows that Father has made any real progress leaving his life of crime. The only plan that Father could articulate for maintaining a drug-free lifestyle was based on prayer and hope, rather than concrete steps.

Father takes issue with DCS's failure to provide reasonable efforts to Father. The evidence shows, however, that Father generally avoided contact with DCS. Simply put, DCS cannot provide services to a parent that admits he purposefully avoided any contact with the agency. Indeed, while Father excused his failure to contact DCS while not incarcerated as a way to avoid future incarceration, Father offered no excuse for his failure to reach out during the many months that he was incarcerated. Simply put, Father has not shown that he has adjusted his me-first attitude in a way that makes returning the child to his care safe and in her best interest. These factors favor termination.

The evidence further shows that due to the removal of the child at such a young age and Father's refusal and/or inability to maintain visitation with the child, the child has no relationship with Father, meaningful or otherwise. Tenn. Code Ann. § 36-1-113(i)(3) & (4). Father attempts to minimize the evidence supporting these factors by pointing to evidence that he tried to seek photographs of the child while she was in DCS custody. This argument, however, ignores that Father outright denied that he would have taken such action, as maintaining contact with DCS could put him at risk of capture for his outstanding crimes. These factors strongly support termination.

The child is bonded to her foster family, where her sibling also resides. In contrast, Father is a stranger to the child. Although no proof was specifically presented that a change in caretakers would be harmful to the child, common sense dictates that removing a child from the only family she has ever known and placing her with a stranger who has historically chosen to put his own desires ahead of the child's needs would cause harm to the child. Tenn. Code Ann. § 36-1-113(i)(4); *see also* **Dattel Family Ltd. P'ship v. Wintz**, 250 S.W.3d 883, 892 (Tenn. Ct. App. 2007) ("This Court . . . is not required to check common sense at the courthouse door."). Again, this factor weighs heavily in favor termination.

Father does not address the remaining factors contained in section 36-1-113(i). Although there is no evidence that Father has shown brutality, abuse, or neglect toward the child or other members of the household, see Tenn. Code Ann. § 36-1-113(i)(6), Father's admitted issues with illegal drugs and his failure to articulate a concrete plan for remaining sober following his incarceration leave this Court with substantial doubt that Father will be able to maintain sobriety and avoid criminal conduct in the future. *See* Tenn. Code Ann. § 36-1-113(i)(7). Other than Father's drug issues, there was no evidence that Father's mental or emotional state would be harmful to the child. Tenn. Code Ann. § 36-1-113(i)(8). There was also no evidence at trial as to whether Father paid support. Tenn. Code Ann. § 36-1-113(i)(9).

On the whole, we conclude that the best interest factors clearly and convincingly support termination of Father's parental rights. Father has voluntarily chosen to engage in activity that has made him a stranger to his child. His plan for the return of the child gives this Court little confidence that he is ready and able to parent his daughter. Father simply asks this Court to believe that although he chose to engage in repeated criminal conduct for essentially the entirety of this child's life, he has now turned the corner and is able to parent his child when he is released from incarceration. Even if we were to credit Father's optimistic outlook, Father could not begin to parent his child for at least another nine months. The child deserves permanence now with the family that has cared for the child and her sibling for essentially the child's entire life. The trial court's finding that termination is in the child's best interest is therefore affirmed.

## V. CONCLUSION

The judgment of the Wilson County Juvenile Court is affirmed and this matter is remanded to the trial court for all further proceedings as are necessary and consistent with this Opinion. Costs of this appeal are taxed to Appellant Michael M., for which execution may issue, if necessary.

_____
J. STEVEN STAFFORD, JUDGE